Good morning, Your Honors, and may it please the Court, Wayne Clayton, on behalf of plaintiff and appellant Norman Dillard, I'd like to reserve four minutes for rebuttal, please. This case is about Norman Dillard, an African-American career hospitality professional who rose through the ranks at Hilton Hotels to the director level position. as director of food and beverage, just one step below the general manager position. After a brief stint at another hotel, Mr. Dillard was hired as the director of food and beverage at the Hilton Orange County. In that position, he was one of only two African-Americans at the management level and the only African-American at the director level. Mr. Dillard had a record of superlative performance, receiving the highest ratings possible from his immediate supervisor, the general manager, Kevin Kennedy. Indeed, his performance was so good, he was on a short list for promotion to a general manager position, a national list. However, as Mr. Dillard's evidence shows, this changed in the spring of 2013 when a new Caucasian director of human resources started a campaign against him. Can I ask you, I think I see where you're going, but let me just ask it directly. Is your theory, let's just focus on the race discrimination claim. Is your theory that Kennedy himself was motivated by racial animus or rather that his decision to fire was influenced by this person that you're about to describe? It's that the decision was either made by the human resources director or that she infected the decision making and influenced. What's her name? What's. Just so we can refer to people by names, what's that? He's going to turn a turn. That's right. OK, so your theory is that Turney is the one who had racial animus against your client. Yes. And what's the support for that? Part of the support is. And also an institutional at that particular Hyatt Hotel. But with respect to your question as to Miss Turney, she repeatedly and we have evidence of this in the record. She repeatedly told Mr. Dillard as he testified in deposition that she wanted to replace him with another food and director, another director of food and beverage. And friends who ultimately replaced him. And he is a Caucasian. Right. But tell me if I'm wrong on this. I seem to recall that the context of those remarks was along the lines of when you get promoted because everyone knows you're kind of on the fast track. So when you get promoted, there's going to be a vacancy. And boy, I sure would like to have my friend come in and fill your vacancy once you get promoted. No, that that overstates it a little bit. It was when you're gone. And Council did follow up with Mr. Dillard and said is one of the ways you could be gone is that you got promoted. But it was not that she said when you're promoted, she said when you're gone. But where's the racial animus on her part? I mean, I think you have a couple of hurdles here because it seems to me that Mr. Kennedy was the ultimate decision maker. But I understand that you're trying to say that he was influenced by Miss Turney. I think that's your theory. Is that correct? Well, that's part of it. But we also believe that there's a tribal issue of fact, whether he was, in fact, the actual decision maker. Well, he signed off. I mean, ultimately, he signed off on the document that said that the termination, I guess, after the PIP. And he was confronted with the incident regarding the fraudulent transaction. Actually, he did not sign off on either of the termination documents. There's the termination memo, which is signed by Miss Turney and the controller and a human resources witness. But the ultimate decision maker was Mr. Kennedy. That is what Hyatt is claiming. We think there's a tribal issue of fact as to that. And I could go through the evidence that raises a tribal issue of fact. But I thought your own client acknowledged that Mr. Kennedy was the ultimate decision maker in his deposition. I mean, he acknowledges that he was told that Mr. Kennedy was the decision maker. I mean, he was not privy to. So then let's look at Mr. Kennedy. What's your best evidence on Mr. Kennedy that there was racial animus in his decision? According to Hyatt's evidence, Mr. Kennedy is in control of much of the hiring and of the hiring at the director level. And in fact, hired your client over a white male, white male, white female. But yes, that is correct. And again, I mean, we are looking at the totality of the circumstances and we believe that it is a combination. I mean, if the jury were to decide that it was, in fact, Mr. Kennedy who made the decision to terminate, it would be our position that Ms. Turney infected that decision. But going back to your question about his racial animus, he did hire Mr. Mr. Dillard. But there were no other African-Americans. Mr. Dillard was presented by the vice president of the National Vice President of Food and Beverage, Ms. Santiago, who is an African-American. We have the email in the record where she says that Mr. Dillard should be the primary candidate for the position. So Mr. Kennedy at that point was receiving pressure from above to hire Mr. Dillard. Well, you don't have any instance in which Mr. Kennedy himself made any kind of racially derogatory remarks. That's correct. Right. I mean, I just it seems to me that's not the most fruitful avenue for you to pursue here an argument, to try to say that you have evidence that Mr. Kennedy himself was motivated by race and deciding to fire. You had alluded to, though, that there was some, I guess, some broader corporate theory of racial animus. Well, I mean, I'm not meaning the broad corporation. I mean, at Hyatt Orange County. And so because there were only two African-American folks at Dillard's levels that. Well, only one at Mr. Dillard's level, a director and four management employees of whom there are 44. There were only two African-Americans. OK. And so what is that? I guess I'm just trying to figure out what does that show in terms of why the decision to fire your client was motivated by race? Well, the courts do hold that statistical evidence is probative and can contribute to finding a pretext. But we're all supposed to be somewhat wary of statistical evidence as well, because we don't know a lot of the other facts contributing to the statistics. I mean, we don't know in Orange County how many. I mean, do even African-Americans reside in Orange County? How many would have applied? I mean, there's all these different factors that are unknown. And so we're supposed to, you know, consider that, take that into account as well. I understand that, Your Honor. And we don't contend that the statistics in of themselves are enough to raise a tribal issue of fact, which gets to one of my primary points is that it's all of our evidence taken collectively, that we believe that the district court did not consider it all collectively. But what I mean, because there was you know, he was on a performance improvement plan. Your client was. And then while on the performance improvement plan, he approved apparently approved a fraudulent transaction by one of his employees. The performance improvement plan specifically addressed his need to be more careful regarding accounting and different information. So I guess how is that pretext? Your Honor, again, this performance improvement plan, we believe the evidence shows at least the jury can have an inference, an inference in favor of the opposing party, that it was brought about by Ms. Turney. She drafted the plan. She was in the meeting when it was given to Mr. Dillard, although Mr. Kennedy was. What's your best evidence that Ms. Turney influenced Mr. Kennedy? Well, the determination was. Are you meaning with respect to the. I mean, because I'm trying to find out what's your strongest argument that Ms. Turney was motivated by discriminations or that her actions demonstrate some sort of pretext. I think that was along the lines what Judge Watford was asking about. But then it seems like you have to establish that based on your theory. And then you have to also show that somehow she influenced Mr. Kennedy. And I looked over the record. I'm trying to see how she influenced Mr. Kennedy in such a way. And so this is your opportunity to give me your best. With respect to the termination, she is the one that drafted the termination. She's the one that told Mr. Dillard that he was terminated. Mr. Kennedy was away on vacation in Florida. Mr. Kennedy did not remember having seen the termination memo in deposition. The termination memo is addressed directly from Ms. Turney to Mr. Dillard. And I've already gone through who signed it. For example, with the performance improvement plan that you raised, even though she's the one that drafted that, it was in Mr. Kennedy's name. There is not a scrap of documentary evidence that Mr. Kennedy was involved in the decision to terminate Mr. Dillard. Mr. Coleman, a vice president of human resources nationally, testified that Ms. Dillard did have the authority, as the director of human resources, to make the termination decision, even of a director-level employee. I guess even if somehow, I mean, show that Mr. Kennedy relied on Ms. Turney's recommendation, I mean, isn't it relevant that Mr. Kennedy strongly supported Mr. Dillard? I mean, by hiring him, he promoted him. Subsequent to his termination, he also was strongly supportive of him. I'm having trouble seeing any. See, those facts you just identified, I think, inferences can be drawn either way. Inferences could be drawn, for example, with respect to Mr. Kennedy giving a strong recommendation after Mr. Dillard had been terminated. The stated grounds on the termination memo was that it was for a business conduct and ethics violation. The person that he made the recommendation to was a 25-year friend who was a fellow general manager and was asked specifically, if you were in my shoes, would you hire him? And he said yes. So this demonstrates at least an inference that he was. If there was racial animus or somehow he was influenced by Ms. Turney, why would he do that? I mean, it seems like Mr. Kennedy felt like he had no choice. Once Mr. Dillard was put on the performance improvement plan, they had warned him. They had given him specific indications of what he needed to do. And then there's this issue with Mr. Turner. I think it's Josh Turner, the employee. Smith. Smith. And the approval of the fraudulent transactions after he'd been specifically told to look out for those. And then it looks like the situation regarding this other general manager was in a different situation. I think he's starting up. There's some question of whether it was a new hotel or a Hyatt hotel or not. But it just seems like Mr. Kennedy was still supportive, but had to do what he had to do in light of the potential consequences for Mr. Kennedy if he'd kept Mr. Dillard on. Again, I believe that those are inferences that a jury can make, but the jury could also make a reasonable inference from the fact of him recommending him under those situations, under that situation, that it was, in fact, Ms. Turney that made the decision that he wasn't, that he was going to support her and not turn back on that, and so that he still did make the recommendation based on Mr. Kennedy's excellent performance. Your time is up, but I'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. May it please the Court, David Friedman for Hyatt Corporation. Under the McDonnell-Douglas framework that we have to look at this case at in the posture it's in, it's the burden of Mr. Dillard at this juncture in opposing Hyatt's stated nondiscriminatory legitimate reason to present not just any evidence or any kind of inferences. He has to present specific and substantial evidence. Well, let me ask a couple of questions there, though, because I found it interesting that, you know, does the record reflect that there was anything more than a $150 charge by Mr. Smith that was fraudulent? I mean, it seems like there's one incident here, and that's it. With regard to Mr. Smith, I think that that's correct, that there was things that he said were not business-related, and there were many transactions he could not justify as being business-related. So there's two different aspects to it. As to Mr. Dillard, the evidence showed that he, by his own admissions, both to Ms. Turney and to Mr. Kennedy and in deposition testimony that you see, failed to adequately supervise. He never questioned. He never asked for receipts. He merely accepted the representations. But it appears that Mr. Dillard raised the issue of Mr. Smith's P-Card in the first place to Mr. Kennedy. But, well, I'm not sure that's correct. They learned that there had been transactions in Hawaii, and Mr. Kennedy then discussed that with Mr. Dillard and Ms. Turney and told them to investigate. But the investigation revealed this pattern of nonfeasance or malfeasance by Mr. Dillard where he was not monitoring these transactions without regard to the amount of a loss and without regard to whether the transactions were legitimate or not. There were $13,000 worth of transactions, and Mr. Dillard's statements and testimony demonstrated to Mr. Kennedy that Mr. Dillard lacked financial control over his subordinate. That was the business judgment that he reached. But a lot of Mr. Smith's P-Card use occurred before Mr. Dillard was put on the performance improvement plan. That's right, and the two things are not connected. Right. Mr. Kennedy said he terminated him because of the lack of supervision of the P-Card. So then how come, you know, $150 of the subordinate's misuse justifies termination of someone who has been receiving such high performance ratings prior to that? That's not what Mr. Kennedy explained in his declaration that supported the motion. He based the decision upon evidence showing that for a long period of time, Mr. Dillard had not been adequately supervising the P-Card usage by verifying receipts and verifying the purpose. That would have been, and if I can go a little bit beyond what he's saying, is he's not saying we suffered a loss. He's saying we don't have control in our department. I have a director in charge. I have a subordinate of him who's using the P-Card. He's charging over $13,000, and Mr. Dillard is not managing that process effectively without regard to whether there was a loss. And there's some question, though, whether Mr. Dillard had adequate training for that. What's your response? My response is that in the papers there was an argument made below that he was not trained in using the P-Card, and that's not the question. The question is whether he knew and understood he had an obligation to have financial controls and to verify how the P-Card was used, not the P-Card procedure itself. And he had an obligation under Hyatt's business ethics policy, which is the policy cited in the termination documents, and the policy cited by Mr. Kennedy in his declaration. That's the policy. But there's nothing in the written policies that your client has provided to us, at least, that spells out the obligation of someone in Mr. Dillard's shoes to actually scrutinize the receipts themselves. That's right. There's nothing in those policies. Right. So just let me make sure I've got the facts straight. As I understand it, the subordinate's use of the card, there's some notation that the subordinate needs to make for each charge, like explaining, I don't know, what the purpose of the charge was? That's right. And Mr. Dillard said he did, for most of the transactions, scrutinize that. But what Mr. Kennedy, as I understand it, faulted Mr. Dillard for not doing was going further and not just sort of taking the subordinate's word, but rather let me see the documentation so that I can verify that what you're saying is true. That's basically it. Okay. So why isn't there a factual question as to whether, in fact, within this particular hiat, that was Mr. Dillard's responsibility as opposed to, say, accounting's responsibility? They have not raised ñ they have not presented any evidence that it was not Mr. Dillard's responsibility. Mr. Dillard testified in deposition, and we cite it in the papers. He knew that was his obligation. To look at the receipts? I don't think he ever said that. Yeah, to look at the receipts and to verify. Give me a second for that. I don't remember that. Just give me a moment, please. Okay. It's in page 8 of our brief. I don't have your brief in front of me. What page is that? Well, the record would be at ER 331, beginning there, and then at ER 428 to 430. Hang on a second. ER 331, you said? I'm sorry. Skip that site. Okay. Give me the other one. ER 428, line 11 through 25, and ER 430, line 3 through 18. Okay. See if I can find that. You said 428? 428, line 11 to 25, and then page 430, line 3 through 18, and then page 429, line 19 to 23, and 431, line 16 to 433, line 3. And in our brief, we cite those sections for evidence of the following, that he knew and understood that Smith was supposed to use the P-Card for only hotel expenses and had to submit a receipt for every purchase and write a note in the reporting system to explain. Hang on. Let's just look at, since you gave us this site, let's look at 429 at the top there. Do you have it in front of you? I'm sorry. I don't have that. Okay. Well, let me read it to you because it seems to contradict what you just told us. The question is, did you understand when he got the P-Card, I assume Smith, that you would have some responsibility to supervise or review his use of the P-Card? Answer, no. Did you have an understanding that somebody would be responsible for that? Yes. Who did you understand would be responsible? My initial understanding was that all of the receipts would go to accounting and that I would receive an electronic verification with backup on the exact charge. That doesn't sound like he's acknowledging that he thought he needed to review the receipts. Well, at the next page, page 429, there's evidence that he knew and understood that he had to approve or reject the transactions based on the information that Smith was providing. That's what I said. So he's looking at the little notation, and I grant you that he's acknowledging that, yeah, I was supposed to review the notation, and if the thing said presents for my kid's birthday party, well, yeah, sure. If he approved that, there would be a problem. But presumably Smith was giving some, you know, I bought supplies for the company, whatever. And so, as I understand it, Dillard said, my duty to supervise my subordinate's use of the card ended when I verified that the notation was correct. In terms of the backup, the receipts that would document that, I understood accounting to be responsible for that. I'm not sure that's exactly accurate. If you go to page 435, line 12 through 21, and 439 at 18 through 21, Mr. Dillard testified that after Smith got the P card, that Mr. Dillard asked for an explanation and the receipts for his purchases, and that after the initial purchases, he stopped requesting Smith to submit receipts and never took any steps to verify that the expenses were for legitimate purposes. So it's true he may have looked at what Mr. Smith notated, but he didn't go beyond that to verify by looking at the receipts or talking to Smith or doing anything else. He took at its face value when Mr. Smith made a purchase and put a note in. He accepted that. He didn't do anything else. That was the failure to maintain control over the P card. He merely accepted Mr. Smith putting in an electronic system, and he didn't do anything to verify or to test the veracity of what his subordinates were submitting. Right, but his position is that I was never trained to do that. I was never told that that was one of my responsibilities, and the written policies, at least, that you've provided us don't say that it was his responsibility. So isn't there a factual dispute? You've got Kennedy saying that he thought it was Dillard's responsibility, Dillard saying they never told me that. Why isn't that for the jury to resolve? Because, well, in summary judgment, we've proffered a legitimate Mr. Kennedy's explanation that I lack confidence or found that he didn't exert control. That's a legitimate nondiscriminatory reason. The question is not whether it was wise. The question is not whether it was correct. The question is, is there substantial evidence, specific evidence, showing that that's a false reason or that that reason is not worthy of credence? Yes, because if you credit the plaintiff's version of the facts, which we have to on summary judgment, he's saying that I was fired because I didn't verify the receipts. That's the problem that Kennedy identified. They never told me, ever. They never trained me, ever, that that was my responsibility. I look at the written policies. There's nothing in there that says that's my job as opposed to accounting. And so then we have Kennedy, on the other hand, saying, well, I have a different understanding. I think, though, the burden at this point on summary judgment is for him to show that the reason that Mr. Kennedy gave was not Mr. Kennedy's real reason, that Mr. Kennedy was using that reason as a cover-up for a different reason, which was discrimination. There is no evidence that Mr. Kennedy ever told anybody he had a different reason. There's no evidence that he ever expressed any racial animus. And Mr. Dillard cannot raise a tribal issue under the Ninth Circuit cases. He cannot raise a tribal issue by questioning the wisdom or questioning the judgment of Mr. Kennedy. Yes, he is. No, he's not. He's saying it's not legitimate because nobody ever told me in the company that this was my responsibility. My understanding actually was, to the contrary, it was accounting's responsibility. Somebody has to resolve that factual dispute. I think he's saying it was accounting's responsibility to collect receipts. He testified, and it's in the record, he knew he had to look and he had to approve. So he had a function. He knew he had an approval function. So he can't deny that he had a role in the PCARD process. He can't say, as long as there was an appropriate electronic notation, that's what his role was limited to. Well, he's not a mechanical function. He's not just doing a clerical function. He's the director of the department. There are expenses being made on behalf of the hotel. And he testified he knew he had a responsibility to ensure that the PCARD was being properly used. And proper use requires him to look at the transactions and to ask about them, not merely to click a box saying okay. That's what he had judgment. He was the director. He's not a clerical employee. He's not an accounting clerk. He's the director of an apartment. He has a credit card of the hotel in the hands of a subordinate who's charging over 100 times over $13,000. And his responsibility as the director, which he acknowledged, was to maintain financial controls in his department. How about the manager at the other Hilton? The other Hyatt? Sorry, Hyatt. Yes, I paused. Well, I think as the district court pointed out, Mr. Diller did not present any evidence of the facts relating to that alleged PCARD violation. He did not present any evidence to show that that was a similarly situated person. He identifies a person who he said he thinks was not disciplined, but he has no evidence that the person wasn't disciplined. Let me give you my version of facts, and you correct me if I'm wrong. I thought in terms of this other person, it was that that person's subordinate misused the card in some fashion and got fired for it. Is that wrong? No, no, no. He said the subordinate at that hotel got fired. Yeah, for misusing. And somebody else didn't get fired. Okay, yeah. So the subordinate misused the card, just like Smith did here, right? That employee at the other Hyatt, if I got it right, got fired for doing that. And then his supervisor, the person analogous to Mr. Dillard, did not get fired for having failed to supervise that person's use of the PCARD, right? That's the argument, but the problem is there's no evidence. It's his testimony. He says, I was at the other hotel. No, no, he wasn't. He didn't say he was at the other hotel. He heard about it. I thought he said afterwards he went to that other hotel, and the guy was still there. The manager was still employed there. Hadn't been fired. I'm sorry, Your Honor. No, that's not what he said. He identified what happened at a Hyatt-Irvine hotel. Mr. Dillard never said he went to work for the Hyatt-Irvine hotel. Okay. And the district court addressed this issue, and I guess my only response, the best response I could do is just quote what the district court said, which is that Dillard states there's no evidence, or Dillard asserts that at a different Hyatt hotel, a Caucasian supervisor was not terminated for the director of engineering's misuse of a fee card. However, the employee to whom Mr. Dillard compares himself worked at a different hotel, held a different position, and reported to a different manager. Dillard does not offer any evidence regarding the nature of the violation, whether the other employee was responsible for overseeing the use of the card, or the discipline to which the other employee was subjected. Because he's not shown that he was similarly situated to the other employee, the other employee cannot be used as a comparator. So there just simply wasn't any evidence, and isn't any evidence of the record, where Mr. Dillard can fairly compare himself to somebody else. And I should also point out a different decision maker. It wasn't Mr. Kennedy he's talking about. He's not saying Kennedy treated a Caucasian employee differently than me. He's saying somewhere else something else happened differently than what happened to me. Thank you very much. Thank you. Very quickly, Your Honors. With respect to the issue that Judge Watford was just raising, in fact it was the written policy that the receipts would go to accounting, and that's at ER-283, and that's confirmed by Ms. Turney that that was the policy in effect at the time at ER-188-24 to ER-189-3. With respect to Judge Merguia's question about a basis to infer racial animus, this case is quite like Reeves versus Sanderson-Plumbing, the U.S. Supreme Court case. In that case, there were also issues of there was alleged fabrication of documents and not properly supervising subordinates and the company paying too much money in wages. The Supreme Court found that a prima facie case with pretext is enough to infer discriminatory intent. And finally, with this Court's recent 2015 decision in Nigro versus Sears-Roebucks, the Court held that we have previously held in several cases that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion. This is because the ultimate question is one that can only be resolved through a searching inquiry, one that is most appropriately conducted by a fact finder upon a full record. And I would just add that here in the 21st century, some employers have become quite sophisticated at hiding unlawful discrimination. So it's best when the decision can be made with the witnesses on the stand and the demeanor for the jury to determine who's telling the truth. All right. Thank you very much. Thank you very much, Your Honors. Thank you both for your arguments here today. The case of Dillard versus Hyatt Corporation is now submitted.
judges: Murguia, Watford, Vanaskie